# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

UNITED STATES OF AMERICA,

          **Plaintiff,**

v.                                  **Case 2:13-cr-20373-SHL**

KEITH MOTLEY,

          **Defendant.**

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS

## ORDER FINDING AS MOOT DEFENDANT'S MOTION TO STRIKE
## GOVERNMENT'S AMENDED RESPONSE TO
## DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Keith Motley's Motion to Suppress (Docket Entry "D.E." #20) and Defendant's Motion to Strike Government's Amended Response to Defendant's Motion to Suppress ("Motion to Strike") (D.E. #33). The instant motions were referred to the United States Magistrate Judge. (D.E. #22). For the reasons set forth herein, it is ORDERED that Defendant's Motion to Strike is MOOT and it is RECOMMENDED that Defendant's Motion to Suppress be GRANTED.

## I. Background

On December 12, 2013, Defendant was indicted for knowingly possessing a Ruger .380 caliber semi-automatic pistol in and affecting interstate commerce after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18

U.S.C. Section 922(g)(1). On February 26, 2014, Defendant filed the instant Motion to Suppress. (D.E. #20). After obtaining an extension of time, the United States filed its Response to Defendant's Motion to Suppress on March 19, 2014. (D.E. #25). The Magistrate Judge held an evidentiary hearing on the instant motion on May 19, 2014. (D.E. #29).

Following the evidentiary hearing, the Government filed an Amended Response to Defendant's Motion to Suppress. (D.E. #32). Defendant subsequently filed a Motion to Strike Government's Amended Response to Defendant's Motion to Suppress ("Government's Amended Response") (D.E. #33), arguing that the Government did not seek Court approval to file this "clearly out of time pleading." As the Magistrate Judge did not request further briefing from the parties after the hearing, the Court declines to consider the Government's Amended Response. Thus, it is ORDERED that Defendant's Motion to Strike is MOOT.

## II. Proposed Findings of Fact

On April 22, 2013, Officer Christopher L. Gibson ("Officer Gibson") and Officer Allison of the Memphis Police Department ("MPD") responded to a "fight call" at Central High School in Memphis, Tennessee. (May 19, 2014 Hearing Transcript ("Tr.") at 6-7, 15, 39). This location is "in the middle of" the area that Officer Gibson normally patrols and includes both Central High School and the Pinnacle Apartments. (Tr. at 9). Upon arriving at the scene, Officer Gibson observed that "approximately 10 to 15 juveniles had gathered on that corner and were pushing and shoving people." (Tr. at 7). Officer Gibson and Officer Allison parked on the northwest corner of Vance and Bellevue, which is across the street from the school, and spent approximately two to four minutes resolving the situation and "disburs[ing] the crowds." (Tr. at 7-8, 26).

After resolving the incident that brought Officer Gibson and Officer Allison to the vicinity,

Officer Gibson encountered the Defendant. (Tr. at 8). Officer Gibson knew of the Defendant because he had "dealt with him on numerous occasions." (Tr. at 8-9). Specifically, Officer Gibson estimates that he had dealt with the Defendant on five prior occasions. (Tr. at 27-28). On the first occasion that Officer Gibson met the Defendant, which he estimates was "probably a year or two prior" to the April 22, 2013 encounter, Officer Gibson responded to "reports of people on top of the Pinnacle Apartments." (Tr. at 31). Officer Gibson contacted the Defendant because he was the "manager of the building" or "boss" at the Pinnacle Apartments, and the Defendant told Officer Gibson "how to get up to that location" to respond to the reports. (Tr. at 9, 31-32). Officer Gibson also "regularly" had contact with the Defendant in his capacity as "one of the people in charge of the building that [MPD] had to [make] contact with" when he responded to "several calls" at the Pinnacle Apartments. (Tr. at 32).

On one of these occasions, Officer Gibson responded to a call to the Pinnacle Apartments that the Defendant was "acting as a security guard for the property" and "had gotten into an argument with one of the tenants." (Tr. at 9, 34). Officer Gibson testified that, upon such a complaint, "it's routine that [MPD] check to see if the credentials that he was acting under are actually valid." (Tr. at 34). Officer Gibson testified that his investigation determined that the Defendant's "security guard license had expired" and that he had no valid authority to be serving as an armed or unarmed security guard at that time. (Tr. at 9, 34). Officer Gibson came to this conclusion because the Defendant "did not have any identification" or an "expired license" on his person but merely had "the paperwork to renew his license," Number 00306210, to be an unarmed security guard. (Tr. at 9, 12, 28-30, 32-33). Ultimately, Officer Gibson determined that the Defendant was unlawfully in possession of a firearm on that occasion and he was taken into custody

"for having a firearm without any type of lawful license." (Tr. at 9, 34).

After this incident, Officer Gibson continued to occasionally encounter the Defendant. (Tr. at 23). On "every" one of these subsequent occasions, when Officer Gibson would see the Defendant, he would "command"[1] the Defendant to "lift his shirt to show [Officer Gibson] what's on his person." (Tr. at 23-24).[2] One such occasion occurred at an Exxon gas station, where Officer Gibson testified that the encounter was "consensual," that he "merely ask[ed the Defendant] a question[] . . . [f]or officer safety," and that the Defendant was neither detained nor arrested. (Tr. at 23, 35-36). Officer Gibson testified that he did so without any reason except for his prior experience with the Defendant and did so "irrespective of whether [he was] dealing with [the Defendant] or not." (Tr. at 23-24). Officer Gibson did not testify as to whether he found the Defendant to be carrying a firearm on any of these occasions. Officer Gibson further testified that the Defendant never presented a "carry permit" to him during these encounters. (Tr. at 36).

Officer Gibson testified that he did not believe that these routine commands to the Defendant to lift his shirt on every occasion that he saw him constituted searches because the Defendant would "expose[] his area to me" and because Officer Gibson "did not place hands upon him." (Tr. at 24). Officer Gibson testified that the Defendant has always submitted to his authority, cooperated with his instructions, and has never been threatening toward him. (Tr. at 24-25). Officer Gibson further

---

[1] When asked if the Defendant would lift his shirt as a result of his "command" to do so, Officer Gibson replied that, in "the United States of America you have a right to refuse anything that a police officer says unless it is a command." (Tr. at 24). When asked if the Defendant complied at his "command" on these occasions, Officer Gibson replied, "Yes. Me asking him, he did those commands." (*Id.*)

[2] Prior to Officer Gibson's arrest of the Defendant for unlawful possession of a weapon, he had not searched the Defendant or inquired as to whether the Defendant was carrying a weapon because "[t]here was no reason to." (Tr. at 31-32).

testified that he would "check" the Defendant in this manner "every time" he would see the Defendant for purposes of "officer safety." (Tr. at 24). Specifically, when asked if he was "just guessing to see if or playing a hunch as to whether or not he has a weapon," Officer Gibson responded as follows: "Sir, I like to go home with the same amount of holes that I leave the house in; and if that individual has a weapon and they might do harm to me, I would like to know it beforehand. So, I check him every time because I know him to carry a firearm." (Tr. at 23). Officer Gibson testified that he had no reason other than his "desire to go home in the same condition that [he] arrived to work [in]" to feel any "threat" from the Defendant. (Tr. at 25). It was in the context of these fairly extensive dealings between Officer Gibson and the Defendant that the April 22, 2013 encounter that is the subject of the instant motion occurred.

At the outset, Officer Gibson and Defendant dispute significant portions of how the April 22, 2013 encounter transpired. (Tr. at 9-10, 27, 36). Officer Gibson testified that Defendant "came up in[] an SUV" of which Officer Gibson had "prior knowledge," "stepped out into the sidewalk," "approach[ed]" Officer Gibson "out of the blue" with a "huge smile on his face," told Officer Gibson that he wanted to talk to him, that he wanted to tell him something, that he had gotten his "security license fixed," and that he wanted to show him something. (Tr. at 9-10, 27, 36). Officer Gibson testified that he did not call the Defendant over to him and that he did not believe that he called the Defendant by his first name. (Tr. at 27).

Officer Gibson testified that he first asked the Defendant, in response to the Defendant's exclamation that he had gotten his security guard licensing fixed, "Are you carrying it now?" (Tr. at 10). It is not clear to the Court whether Officer Gibson was initially asking whether the Defendant was carrying a proper security guard license (Tr. at 10) or whether the Defendant was carrying a

firearm (Tr. at 12-14); however, it appears from his testimony that Officer Gibson asked both of these questions at some point during the initial stages of his interaction with the Defendant (Tr. 10, 12-14). Officer Gibson testified that he asked the Defendant about whether he was carrying a weapon because he "saw a bulge" at the initiation of the encounter. (Tr. at 13).

Officer Gibson also testified that he recalled that the Defendant was displaying a security badge around his neck on the outside of his shirt but that he could not determine from viewing the badge if the Defendant was a "valid security guard or not." (Tr. at 19-20). Officer Gibson testified that the Defendant's security badge had "security officer" written on it, that it had a "star in the middle," that it was "approximately shaped the same as what a Memphis Police Department badge is," that it was "on a leather holder," and that some type of "chain" of either "metal or cloth" was "holding it around his neck." (Tr. at 19).

Officer Gibson testified that the Defendant responded to this initial question regarding whether he was "carrying it now" in the negative and that the Defendant then "picked up the front of the shirt" around "the belt buckle area." (Tr. at 10, 12). When the Defendant did so, Officer Gibson testified that he again "saw a bulge"[3] and that, specifically, "[t]here was leather on his belt and a bulge on the right side of his body." (Tr. at 13). Officer Gibson testified that he responded to the Defendant, "No, no, no. Show me the whole thing." and "let me see all your whole side." (Tr. at 10, 14). He also testified that he asked the Defendant at this point, "Are you carrying a weapon now?" due to his observance of the bulge on his side. (Tr. at 20).

Officer Gibson testified that viewing the bulge on the Defendant's right-hand side constituted

---

[3] Officer Gibson testified that he first saw the bulge "before he even flashed me" and then again saw the bulge when the Defendant lifted his shirt. (Tr. at 13).

a "visual pat-down" and that the bulge was consistent "with a gun in [his] prior experience." (Tr. at 22). Officer Gibson testified that he did not "conduct a pat-down of his outer clothing" once he saw the bulge because, "[i]f I see it, I don't have to pat it down" and because, during a search, he is "allowed to move clothing to visualize what is a weapon or not a weapon for officer safety." (Tr. at 22).[4]

Instead of conducting a pat-down through the Defendant's clothing upon viewing the bulge, Officer Gibson testified that he "retained [the Defendant's] right arm so he couldn't sweep, if that was what he was going to do, and lifted up the right-hand side of his shirt, exposing the firearm," which was "[o]n his right hip in a holster" and "[i]n the center of his hip on the — his belt side." (Tr. at 10, 14, 20-22).[5] Officer Gibson testified that he could not recall "if it was on the inside or outside" of the Defendant's pants. (Tr. at 14). Officer Gibson further testified that, when he "pulled up his shirt all the way," he also "observed an ASP baton, one of those extendable batons that the police department uses," along with the firearm. (Tr. at 14). The ASP baton was "on his belt" and "tucked into the waistband." (Tr. at 14). Officer Gibson testified that he said, "Hold on," took the firearm from the Defendant, placed him in custody, and brought him over to his car. (Tr. at 10).

Officer Gibson testified that he then asked the Defendant, "Where's your license?" because the Defendant had said he had gotten his "license done." (Tr. at 10). Officer Gibson testified that he inquired about the security guard license because he was "not going to lock up somebody . . .

---

[4] Officer Gibson clarified that, at this point, he had only see a bulge consistent with a firearm but did not see the firearm itself. (Tr. at 22).

[5] Although Officer Gibson testified that he believed that his commands to the Defendant to lift his own shirt on prior occasions to determine if he had weapons did not constitute a "search" (Tr. at 24), he testified that he did consider his conduct on April 22, 2013 to constitute a "search" when he "actually lifted his shirt" (Tr. at 21).

that's abiding by the law." (Tr. at 21). It is not entirely clear to the Court how Officer Gibson claims that he obtained the licenses from the Defendant. At one point, Officer Gibson testified that the Defendant "presented" an "altered" license (Tr. at 10); an another point, Officer Gibson testified that he "went into [the Defendant's] . . . pouch and . . . pulled out his . . . unarmed and his armed security guard license[s]" (Tr. at 21, 36-37). Officer Gibson described the two licenses as follows: "It was for unarmed security guard license issued by the State of Tennessee and the 'un' had been whited out and then re-photocopied and I could tell that because the State of Tennessee security guard license is green and the one he presented to me was a black and white." (Tr. at 10 & Collective Exh. 1). Officer Gibson testified that the initial license issued to him by the State of Tennessee either did not allow him to carry a firearm or that the Defendant was not licensed to carry a firearm but that the altered version represented that he was licensed by the State of Tennessee to carry a firearm. (Tr. at 11). Officer Gibson testified that it was at this point, after the Defendant was in custody and his firearm had been recovered, that he was able to investigate whether his security guard license was valid and determine that it was not. (Tr. at 21).

Officer Gibson testified that the Defendant also did not present him with a "carry permit" on this occasion and that he was not did not believe that the Defendant had a valid one; specifically, Officer Gibson testified that he "ran him" on his "PDA and Station B" to check for a carry permit and that "he did not come back with one." (Tr. at 36). Officer Gibson further testified that he also secured the weapon and that he discovered that the firearm was loaded with "bullets in the magazine and in the chamber." (Tr. at 15-16). Officer Gibson did not have any access to the Defendant's criminal history at the time of this arrest other than his own personal knowledge of the Defendant's prior firearm arrest. (Tr. at 9, 34, 36).

In contrast to Officer Gibson's account of the events of April 22, 2013, Defendant recounted his version of the incident in his testimony on his own behalf. Defendant testified that he lived and worked at the Pinnacle Apartments. (Tr. at 45). Defendant testified that he was employed by the Pinnacle Apartments as a "security guard" and "assistant manager." (Tr. at 45). Defendant testified that he was not issued a badge by the Pinnacle Apartments but had a badge as his "own personal equipment from other jobs" that he carried on his person in the course of his employment duties at Pinnacle Apartments. (Tr. at 45-46). Defendant testified that he was an "active security guard" and that the residents know of his position because they know he works "in management" and that he sits "in the security office." (Tr. at 46).

On the date in question, Defendant was "working in the afternoon as usual, blocking off [the] driveway to keep the parents from pulling through [the] driveway and clogging up and the kids coming onto the property." (Tr. at 40). Defendant testified that he would normally sit in the parking lot in this manner "Monday through Friday to keep the school children and the parents from using [the] parking lot [as] a school pickup zone because they have the pickup zone across the street." (Tr. at 44).

He testified that, on that afternoon, he parked his truck to block the entranceway as he did usually on weekdays. (Tr. at 44). Defendant testified that he was "sitting in [his] truck" and got out to stretch his legs. (Tr. at 40). Defendant testified that, when he got out of his truck, he "noticed Officer Gibson . . . [s]itting out front of — on the street," that Officer Gibson called the Defendant by his first name and asked him a question, and that he "wasn't quite sure" what Officer Gibson had said. (Tr. at 40-41, 43-44). Defendant testified that, when he did not initially understand Officer Gibson's question, Officer Gibson "beckoned" for him to come over and that he "[f]ollowed orders

of the officer . . . to walk to him." (Tr. at 41). Defendant testified that he did not initiate the interaction with Officer Gibson. (Tr. at 43).

Defendant testified that Officer Gibson then asked him, "Did you get that matter straightened out with your license?," to which Defendant did not respond. (Tr. at 41). Defendant testified that Officer Gibson asked him if he had a weapon in his possession and that he did not respond. (Tr. at 41). Defendant testified that he did not recall why he did not respond to Officer Gibson's questions about his license status or his firearm possession. (Tr. at 50-51). Defendant testified that Officer Gibson then asked him to lift his shirt, to which he complied, and that Officer Gibson then "grabbed" him, lifted his shirt himself, and removed the weapon. (Tr. at 49-50). Specifically, Defendant testified that Officer Gibson then "pulled [him] by [his] belt to him, raised up [his] shirt, and located the weapon." (Tr. at 41).

Defendant testified that Officer Gibson "removed the weapon," and "found the baton," and had him "lay it on the car." (Tr. at 43). Defendant admits to possessing both a Compact .380 firearm, which he describes as "very small" and "almost invisible without close inspection," and the baton. (Tr. at 47-48, 53).[6] Defendant testified that his weapon was on his person as follows: "The firearm was placed inside the holster. The clip to the holster's on the outside. You put it inside of your belt where the clip points out. It's inside of your pants, sir. The weapon's not overtly displayed. It's inside of your pants. It was under my t-shirt which was worn out. I always wear my T-shirts out. I never tuck them in." (Tr. at 52). Defendant testified that, upon locating the firearm and baton, Officer Gibson put him in handcuffs and put him in the back seat of his car. (Tr. at 43).

---

[6] The record contains a photograph of the weapon, holster, and baton beside the two security guard licenses, which provides some perspective of the relative sizes of the items. (Tr. at Collective Exh. 1).

Defendant testified that, once he was arrested, Officer Gibson began to investigate the validity of his security credentials. (Tr. at 42). Defendant testified that he keeps his "pouch," which is a "black wallet-type" with a "standard chain and a badge on it," around his neck on the "inside" of his shirt. (Tr. at 42-43). He testified that it is "not displayed" and that it also serves as his wallet. (Tr. at 42). Defendant testified that the badge was retrieved as follows: "[U]pon getting my identification out from inside of my shirt, he went through it and found my identification." (Tr. at 42). It is not clear to the Court if Defendant claims that he retrieved the pouch himself and that Officer Gibson then searched inside of it or if Defendant claims that Officer Gibson retrieved the pouch from beneath the Defendant's shirt himself. (Tr. at 42). However, Defendant testified that his identification is inside of the pouch along with "money and documents like that." (Tr. at 42-43). Defendant testified that one of the licenses "appears to be" altered because the letters "u" and "n" in the word "unarmed" are "covered on one of the licenses." (Tr. at 51). Defendant testified that he did not alter the license and that he assumed that the "person that laminated it" altered it. (Tr. at 51).

Defendant testified that, on the prior occasion when he was arrested by Officer Gibson for unlawful firearm possession, he did have a valid unarmed security guard license and that "the paperwork was being renewed or mailed in" because he was required to pay a fee to renew every two years. (Tr. at 46-47). Defendant also testified that, subsequent to Officer Gibson's initial arrest of him, Officer Gibson would check to see if he had a weapon in his possession. (Tr. at 44). Specifically, Defendant explained these encounters as follows: "Officer Gibson, when he sees me, sir, asks me do I have a weapon and generally he'll make me raise up my shirt and make me turn around so he can observe whether or not I have a weapon almost every time he sees me." (Tr. at 44).

Defendant testified that Officer Gibson does so whether the Defendant is "interacting with him or not" and that he does this every time he sees him regardless of what the Defendant is doing. (Tr. at 44-45).

### III. Proposed Conclusions of Law

The issues presented in the instant motion are whether the Defendant's Fourth Amendment rights were violated during the April 22, 2013 encounter with Officer Gibson and, if so, whether suppression of the evidence is the appropriate remedy. Officer Gibson and the Defendant dispute the details of how the encounter was initiated and how the subsequent events transpired; however, they agree that it began as a consensual encounter that escalated to a more invasive intrusion that required heightened justification under the Fourth Amendment. (Tr. at 54-58). The Government argues that Officer Gibson's actions amounted to an investigative detention that was constitutionally permissible under *Terry v. Ohio*, 392 U.S. 1 (1968). (Tr. at 53-57). The Defendant argues that Officer Gibson lacked reasonable, articulable suspicion to justify the investigative detention under *Terry*, that Officer Gibson lacked probable cause to arrest him and conduct a full search of his person, that any evidence directly obtained during the unlawful investigative detention must be suppressed as violative of the Fourth Amendment, and that any evidence obtained subsequent to the unlawful investigative detention should be suppressed as fruit of the poisonous tree pursuant to *Wong-Sun v. United States*, 371 U.S. 471 (1963). (Tr. at 57-62, Mot. to Suppress at 1-5).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment's protections are applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655-60 (1961). "No right is held more

12

sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry*, 392 U.S. at 9 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). "This inestimable right of personal security belongs as much to the citizens on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry*, 392 U.S. at 9.

In determining whether the Fourth Amendment's protections are implicated, the Court must look to the nature of the encounter between law enforcement and the individual. There are three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (internal citations omitted)).

During a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *Waldon*, 206 F.3d at 603. "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not any subjective suspicion of criminal activity." *Id*. A consensual encounter does not implicate the Fourth Amendment's protections, as it does not constitute a "seizure" or "search" to "approach[] an individual and ask a few questions." *Florida v. Bostick*, 501 U.S. 434, 434 (1991). Factors

suggesting that an encounter is not consensual include as follows: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

If an encounter escalates beyond a consensual interaction but also does not yet constitute an arrest based upon probable cause, it may be permissible under the Fourth Amendment if it constitutes a proper investigative detention under *Terry*. In *Terry*, the United States Supreme Court resolved the question of whether it is reasonable for an officer to seize a person and subject him to a limited search for weapons absent probable cause for an arrest. 392 U.S. at 15. The Court determined that the Fourth Amendment applies to what is euphemistically termed the "stop and frisk." *Id*. at 9-10, 16-19. Because such interactions require "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat," they have not historically, "and as a practical matter could not be, subjected to the warrant procedure" requiring probable cause. *Id*. at 20. However, the conduct must nonetheless be "tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id*.

The *Terry* Court held as follows:

[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

14

*Id.* at 30. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 20. "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

In order to assess the reasonableness of an officer's actions, the *Terry* Court established a two-prong inquiry, *id.* at 20-22, and the Government bears the burden to establish that an investigative detention satisfies its mandates, *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). First, a court must determine "the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." *Terry*, 392 U.S. at 20-21. For the court to undertake this analysis, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The court must assess the facts offered "against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more than inarticulate hunches . . . ." *Id.* at 22. The court must also consider the totality of the circumstances under which the officer initiated the search rather than evaluate each fact in isolation. *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

The permissible governmental interests for such an intrusion include "effective crime prevention and detection" as well as the "more immediate interest of the police officer in taking

steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 22-23. "When an officer is justified in believing that an individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id*. at 24.

Second, a court must consider "the nature and quality of the intrusion on individual rights." *Id*. "A search for weapons in the absence of probable cause to arrest . . . must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Id*. at 25-26 (citing *Warden v. Hayden*, 387 U.S. 294 , 310 (1967)). The search "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby . . . ." *Terry*, 392 U.S. at 26. The *Terry* Court noted that, "[e]ven a limited search of the *outer clothing* for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Id*. at 24-25 (emphasis added).

In the case at bar, the parties agree that the interaction began as a consensual encounter that escalated at some point to an investigative detention. The parties dispute, however, at what point the encounter rose to the level that it required reasonable, articulable suspicion under *Terry*. The Government argues that the consensual encounter became a *Terry* investigative detention when Officer Gibson recognized the bulge that he believed to be a weapon and lifted the Defendant's shirt to secure the weapon. (Tr. at 56). The Defendant argues that the consensual encounter became a *Terry* investigative detention earlier in the interaction when the Defendant elected not to respond to Officer Gibson's questioning. (Tr. at 58). The Court will begin its examination by resolving this

dispute.

As already stated, the Defendant and Officer Gibson dispute how the interaction was initiated. Officer Gibson stated that the Defendant walked over to him and initiated the conversation and sought to show him something, and the Defendant stated that he was called over by Officer Gibson by his first name. However, even assuming, *arguendo*, that Officer Gibson initiated the encounter, mere questioning of the individual does not constitute a search or seizure and does not implicate the Fourth Amendment. *Bostick*, 501 U.S. at 434; *Waldon*, 206 F.3d at 603 (permitting law enforcement officers to ask general questions absent "intimidating behavior").

Additionally, the United States Court of Appeals for the Sixth Circuit has held that requests for an individual to come over to the officer do not constitute a seizure. *United States v. Brown*, 447 Fed. Appx. 706, 708-09 (6th Cir. 2012) (reasoning that "simply calling out to someone to come over to talk does not constitute a seizure"); *United States v. Matthews*, 278 F. 3d 560, 562 (6th Cir. 2002), *abrogated on other grounds by*, *United States v. McMurray*, 653 F.3d 657 (6th Cir. 2011) (reasoning that officer yelling, "Hey, buddy, come here" was not an "order" or a detention but a consensual "request that he come hither" that did not implicate the Fourth Amendment). Further, the fact that the defendant elected to comply does not, by itself, transform the encounter into a seizure for purposes of the Fourth Amendment. *O'Malley*, 652 F.3d at 669 (citing Wayne R. LaFave, 4 Search & Seizure § 9.4 (4th ed. 2004) (explaining that "police may rely on the moral and instinctive pressures of citizens to cooperate and that a confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse"). Thus, it is recommended that, under either Officer Gibson or the Defendant's version of events, these initial portions of the encounter that involved mere questioning were consensual.

Next, the Court must consider whether the Defendant's partial lifting of his own shirt was consensual. Again, the Defendant and Officer Gibson dispute how this occurred. Officer Gibson testified that, in response to his question as to whether the Defendant was "carrying it now," the Defendant voluntarily lifted his own shirt partially near the "belt buckle area," which further revealed a bulge near his right hip. The Defendant testified that Officer Gibson asked him to lift his shirt and that he complied. However, once again, even assuming, *arguendo*, that Officer Gibson took the more demanding course of action and asked the Defendant to lift his shirt, none of the factors that the Sixth Circuit has held indicate that a reasonable person would not believe he was free to leave are present at this point in the interaction. Specifically, Officer Gibson had not displayed a weapon, he had not touched the Defendant's person, there is no evidence of a threatening presence of several officers,[7] and there is no evidence of the use of language or a tone of voice compelling compliance. Further, requesting that the Defendant lift his own shirt is "less intrusive than the patdown frisk sanctioned in *Terry*." *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003) (citing *United States v. Baker*, 78 F.3d 135, 138 (4th Cir. 1996)). Thus, it is recommended that Defendant partially raised his shirt consensually and that the Fourth Amendment's protections were not yet implicated.

However, the Court concludes that, when Officer Gibson subsequently grabbed Defendant's arm and raised Defendant's shirt to view his entire waistband area, the consensual encounter escalated to the point that the Fourth Amendment's protections applied. As set forth above, such

---

[7] While the record reflects that Officer Allison was present at the scene, there is no evidence in the record of his participation in this encounter to determine that there was any threatening presence. There is also no evidence that any other officers were present at the scene.

conduct requires heightened justification to be permissible. Thus, the Court will next consider whether Officer Gibson's conduct from the point he grabbed the Defendant's arm and raised the Defendant's shirt to determine the nature of the bulge he saw at Defendant's waistband was permissible under *Terry*.

To address whether the investigative detention was proper under *Terry*, the Court must briefly return to the initiation of the encounter to examine the reasonableness of Officer Gibson's conduct. Specifically, the Court must do so to consider whether he had developed specific and articulable facts to warrant the intrusion of an investigative detention. When Officer Gibson first encountered the Defendant, he knew of him from their prior interactions. Some of these interactions were very unremarkable, including Officer Gibson's contact with the Defendant as the manager of the Pinnacle Apartments to obtain location information for an incident involving other individuals at the complex. These incidents did not provide any basis for Officer Gibson to have any reasonable, articulable suspicion that criminal activity may be afoot on April 22, 2013 or that the Defendant may be armed and dangerous.

Continuing to consider the information Officer Gibson had about the Defendant from their previous encounters, the most notable prior interaction between Officer Gibson and the Defendant was that Officer Gibson had arrested the Defendant on a prior occasion for unlawful firearm possession. During this incident, Officer Gibson also believed that the Defendant was attempting to act as a security guard for the Pinnacle Apartments without a valid license because it was in the process of being renewed, although the record does not reflect that the Defendant was charged for any licensing violation. An officer "may draw upon his experience as a law enforcement agent, including his knowledge of a particular suspect." *United States v. Stennis*, 457 Fed. Appx. 494, 500

(6th Cir. 2012) (citing *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008); *United States v. Davis*, 430 F.3d 345, 354-55 (6th Cir. 2005)). However, an individual's prior criminal conduct, "by itself, does not create a reasonable suspicion that criminal activity is *currently* afoot, which is what the Supreme Court requires." *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (citing *Terry*, 392 U.S. at 30). Thus, the Court will consider Officer Gibson's knowledge of the Defendant's unlawful firearm arrest as only one factor, but not the only factor, that could give rise to reasonable, articulable suspicion that criminal activity may be afoot on April 22, 2013 and that the Defendant may be armed and dangerous.

Also in considering Officer Gibson and the Defendant's prior history, Officer Gibson had approached the Defendant on every occasion following the unlawful firearm arrest to ask him to lift his shirt to investigate whether he had any weapons on his person. The record does not state that Officer Gibson ever found the Defendant to be in violation of the law on any other occasion other than the date of the initial arrest for unlawful firearm possession. The record also does not reflect that the Defendant was carrying a firearm—lawfully or unlawfully—on any of these occasions. Thus, these interactions could not have given Officer Gibson any reasonable, articulable suspicion that criminal activity may be afoot on April 22, 2013 or that the Defendant may be armed and dangerous.

Turning to the April 22, 2013 encounter, before Officer Gibson conducted the search, he had observed the following: (1) the Defendant displaying a security badge around his neck, which he could not determine if it was valid or not;[8] and, (2) a bulge in the Defendant's waistband that Officer

---

[8] Although the Defendant testified that he generally carries his security badge pouch on the inside of his shirt, the Court accredits Officer Gibson's testimony that he viewed the badge at the outset of the interaction.

Gibson believed might indicate that the Defendant was carrying a firearm. Based upon these observations, Officer Gibson sought to determine, as he testified was standard procedure, whether the Defendant actually possessed a valid security guard license or whether he was unlawfully impersonating as a security guard without the appropriate licensure. The Court finds that these observations were sufficient for a reasonable officer to conclude that criminal activity—namely, criminal impersonation[9]—may be afoot and to further investigate whether the Defendant was in fact a licensed security guard.

In order to investigate the matter, Officer Gibson began by inquiring into the status of the Defendant's license and whether he possessed a firearm.[10] While the Defendant initially refused to respond to Officer Gibson's questioning, "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (citing *Florida v. Royer*, 460 U.S. 491 (1983)). Any "refusal to cooperate, without more, does not furnish the minimum level of objective justification needed for a detention or seizure." *Wardlow*, 528 U.S. at 125 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). However, while the Defendant has the right not to answer, it is clear for purposes of *Terry* that, when the Defendant refused to respond, there was nothing in the initial stages

---

[9] Under Tennessee law, criminal impersonation includes "pretend[ing] to be a law enforcement officer for the purposes of: (1) [e]ngaging in an activity that is ordinarily and customarily an activity established by law as a law enforcement activity; and, (2) [c]ausing another to believe that the person is a law enforcement officer." Tenn. Code Ann. § 39-16-301(b). Criminal impersonation under subsection (b) is a Class A misdemeanor. *Id*. § 39-16-301(c)(2).

[10] While *Terry* further instructs that the officer should identify himself as law enforcement, the record reflects that the Defendant was well acquainted with Officer Gibson's status as a MPD officer.

of this encounter that served to dispel Officer Gibson's reasonable fear for his own or others' safety. Specifically, he had yet to determine if the Defendant had a valid security guard license but was continuing to investigate that question in close proximity to an individual with a visible bulge at his waistband that was consistent in Officer Gibson's experience with a firearm. Additionally, it is reasonable to believe that a person may be possessing a weapon if he is being investigated for impersonation of a security guard, an offense that may frequently coupled with weapon possession. *See United States v. Flatter*, 414 F.3d 1154, 1158 (9th Cir. 2006) (concluding that it is reasonable for an officer to believe the suspect may be armed if the potential crime he is investigating is "frequently associated with weapons").

Next, the Defendant consensually lifted his shirt partially around the belt buckle; the Defendant states that he did so at Officer Gibson's specific request, and Officer Gibson states that he did so in response to a question about what he was carrying. Regardless, Officer Gibson was able to further observe the bulge at his right hip and the leather on his waistband that could be consistent with a holster. While the Defendant claims that his Compact .380 is "very small" and "almost invisible without close inspection," and while the Court accredits the Defendant's testimony and finds that the photograph in Collective Exhibit 1 shows a small firearm, the Court also accredits Officer Gibson's testimony that he was able to see "leather on his belt and a bulge on the right side of his body."

The United States Supreme Court has held that the perception of a bulge under a suspect's clothing "permitted the officer to conclude that [the suspect] was armed and thus posed a serious danger to the safety of the officer." *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977); *see also Stennis*, 457 Fed. Appx. at 499 (citing *Mimms*, 434 U.S. at 112; *United States v. Frazier*, 249 Fed.

Appx. 396, 403 (6th Cir. 2007)) (concluding that an "officer's perception of a bulge suspected to be a weapon provides reasonable suspicion that the individual may be armed and dangerous"); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (reasoning that "an officer's observation of a visible bulge in an individual's clothing" is one factor that supports "a reasonable belief that an individual is armed and dangerous"); *Baker*, 78 F.3d at 137 ("observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped for only a minor violation").

Further, the United States Court of Appeals in *Stennis* specifically held that the observation of a bulge coupled with prior knowledge of the defendant's criminal history was sufficient to provide the officer with reasonable suspicion that the suspect may be armed and dangerous. Therefore, given Officer Gibson's prior arrest of the Defendant for unlawful weapons possession and the Defendant's partial lifting of his own shirt to reveal a bulge that Officer Gibson believed to be consistent with a firearm, the Court recommends that this constitutes the type of specific and articulable facts that reasonably warrant an investigative detention under *Terry*.[11]

Even though the Court believes that the investigative detention was justified at its inception, the Court's inquiry under *Terry* does not end there. The Court must continue to consider whether the nature and quality of the intrusion was strictly limited by the exigencies that justify it and, ultimately, whether the search as conducted was reasonable. One consideration is whether the

---

[11] Officer Gibson's concerns would justifiably be even more heightened if, assuming, *arguendo*, that his version of events is accurate and that the Defendant, whom he had previously arrested for unlawful firearm possession, approached him "out of the blue," had a visible bulge at his waistband, and stated that he wanted to show him something. Under such circumstances, a reasonable officer who had previously arrested an individual may have an added concerns for his safety, including any potential for retribution, even though the Defendant had been compliant on all other occasions.

search is "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29; *see also Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979) (permitting limited search only for weapons); *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993) (same). Officer Gibson's actions to determine whether the bulge he viewed was a firearm, as he believed, were reasonable on this ground because he testified that he was searching for a weapon that could cause him immediate harm. His search was also "wholly confined to the area of the bulge in question and was a direct and specific inquiry" into its contents. *United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976). However, this is not the only factor into the reasonableness of the scope of the intrusion. In the instant case, the critical determination is the *manner* in which Officer Gibson elected to check Defendant's person for weapons. Specifically, was it reasonable for Officer Gibson to grab the Defendant's arm and lift the Defendant's shirt without first conducting a pat-down of his outer clothing or performing other less invasive investigative steps to swiftly and accurately determine if he in fact possessed a firearm?

With respect to lifting a suspect's clothing, the *Terry* court specifically noted that the officer in that case "did not place his hands in their pocket or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns." *Id*. at 29-30. Thus, the Court determined that the officer's search in *Terry* was strictly confined "to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons." *Id*. at 30. However, the *Terry* Court explicitly stated that the "limitations will have to be developed in the concrete factual circumstances of individual cases." *Id*. at 29 (citing *Sibron v. New York*, 392 U.S. 40 (1968)).

In light of this language, other courts have expressly held that "a patdown frisk is but one

example of how a reasonable protective search may be conducted." *Baker*, 78 F.3d at 138; *see also*

*United States v. Casado*, 303 F.3d 440, 449 n.5 (2d Cir. 2002) (agreeing with "the general principle

that a patdown is not the only type of search authorized by *Terry* and that there are circumstances

in which a patdown is not required"); *Hill*, 545 F.2d at 1193 (reasoning that "*Terry* does not in terms

limit a weapons search to a so-called 'pat-down' search" and that "[a]ny limited intrusion designed

to discover guns, knives, club or other instruments of assault are permissible").[12]

The United States Supreme Court's decision in *Sibron,* which is a companion case to *Terry*,

provides even more substantial guidance regarding the scope of an investigative detention.

Specifically, the *Sibron* Court considered whether reaching into a suspect's pocket without

conducting a pat-down first was constitutionally permissible and concluded as follows:

> The search for weapons approved in *Terry* consisted solely of a limited patting of the *outer clothing* of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, [the officer] thrust his hands into [the suspect's] pocket . . . . The search was not reasonably limited in scope to the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man. Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents.

392 U.S. at 65 (emphasis added).

Additionally, in *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the United States Supreme

Court emphasized the importance of the pat-down procedure as a minimally intrusive method to

---

[12] The United States Court of Appeals for the Sixth Circuit cited this language in *Baker* in *Stennis*, 457 Fed. Appx. at 501. It did so in its summarization of the Government's position in that case and did not expressly adopt that position. *Id.* However, the *Stennis* court did affirm the District Court's ruling in favor of the Government that officers in that case did not violate the Fourth Amendment. *Id.* at 502.

investigate whether an individual possesses weapons:

> *Terry* itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of *Terry*, after all, is that officers will be able to detect the presence of weapons through the sense of touch and *Terry* upheld precisely such a seizure.

*Id*. at 376. The *Dickerson* court also referred to the presumptive scope of a *Terry* search as a pat down of a "suspect's outer clothing" to feel for "an object whose contour or mass makes its identity immediately apparent" to permit "tactile discoveries of contraband." *Id*. at 375-76.

The United States Court of Appeals for the Sixth Circuit has also provided some guidance on this issue in *Stennis*, although the facts before the court in that case were quite distinguishable from the instant case. Specifically, in *Stennis*, the court considered the scope of a search where the officer began by patting down the suspect's waistband, proceeded to "frisk" the suspect's "groin and upper legs," which "revealed hard bulges indicating contraband," and "reached within [the suspect's] pants to retrieve the guns and drugs." 457 Fed. Appx. at 501. The court noted that "any pulling up of [the suspect's] shirt or jacked was a *de minimus* action attributable to patting down [the suspect's] waist while he was in a seated position." *Id*. at 502. The court further noted that the officer's actions were reasonable because he "did not reach up or grope beneath [the suspect's] outer clothing; he made no attempt to place his hands under [the suspect's] waistband; and he did not reach within [the suspect's] inner clothing or pockets." *Id*. Accordingly, the *Stennis* court found that the scope of this *Terry* search was constitutionally permissible. However, the *Stennis* court did not have occasion to consider a search where the officer did not perform a pat-down but instead lifted the suspect's shirt to search for a weapon.

Other United States Courts of Appeals have considered situations that are factually analogous to the instant case and have reached differing conclusions. One United States Court of

Appeals has permitted the lifting of a suspect's shirt without a preliminary pat-down. In *Hill*, officers received reports of a bank robbery that had just occurred in which the perpetrator told the bank teller that he had a gun and lifted his shirt displaying to the teller what appeared to be a firearm. 545 F.2d at 1192. One responding officer arrived at a location approximately five hundred feet from the bank and, while he was inspecting a vehicle, an individual walked nearby. *Id*. The officer, who did not suspect the individual to be the suspect, requested that he stop and asked him whether he had seen anyone "running through the area who matched the robber's description." *Id*. While conversing with the individual, the officer "noticed a large bulge" at his waistband that he suspected to be a weapon. *Id*. Without conducting a pat-down or asking any questions, the officer "raised [the individual's] shirt which was hanging outside his trousers, thus exposing his waistband and revealing four to six rolls of currency stuffed therein." *Id.* at 1192-1193.

The *Hill* court determined that the first prong of *Terry* was satisfied because the suspect was encountered within five hundred feet of the scene of an armed bank robbery within a short time after its commission and because the bulge in the individual's clothing was consistent with the presence of a weapon. *Id*. at 1193. While the individual's clothes did not match the description of the clothing worn by the perpetrator, the Court maintained that "all the circumstances amply justify the officer's concern for his own safety and justify a weapons search" and that "[a]ny armed person at such a time and place and in such physical and time proximity to an armed bank robbery could reasonably be suspected of being an actual or immediately potential danger." *Id*. The *Hill* court further determined that the second prong of *Terry* was satisfied and that "the lifting by the officer of [the individual's] shirt was not, under the circumstances, overly intrusive." *Id*. Thus, the *Hill* court found that the "raising of the shirt in the instant case is well within the boundaries established

by *Terry*" and the Fourth Amendment was not violated. *Id*.

Two United States Courts of Appeals have found otherwise and have required a pat-down before an officer may inspect beneath clothing. In *United States v. Casado*, 303 F.3d 440 (2d Cir. 2002), officers were conducting surveillance of an area where drug activity was suspected. *Id*. at 441. Officers stationed at various positions utilized their radios to share information regarding any suspicious activity. *Id*. The officers exchanged information that two men entered the area in a vehicle, the passenger exited the vehicle and walked to an apartment building that was "the site of frequent drug sales," the driver parked the car, the passenger returned to meet up with the driver, the driver handed the passenger something that he placed in his front pocket, and they began to walk towards one of the officers' positions. *Id*. An officer decided to approach the men and, when he saw one of the men's hand in his pocket and the other hand over that pocket, he shouted, "Police, take your hand out of your pocket." *Id*. The man looked from side to side, which prompted the officer to draw his weapon, point it at the man, and twice more order him to remove his hand from his pocket. *Id*. The man continued not to comply. *Id*. By this point, other officers from the surveillance team entered the parking lot, approached the man from behind, and took him into custody. *Id*. An officer took the man's hand, pulled it out of and away from his pocket, and, without conducting a pat-down, "reached with his free hand into the pocket where [the man's] hand had been and removed its contents," which included a pager, cash, and crack cocaine. *Id*.

The *Casado* court began its inquiry into the reasonableness of the officer's actions by acknowledging that officers must make decisions in "swiftly developing situation[s]" and that courts "should not indulge in unrealistic second-guessing," because a "*post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police

might have been accomplished." *Id*. at 446-47. The court restated that the "question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Id*. at 447.

In its consideration of the reasonableness of the search, the *Casado* court focused on the second prong of the *Terry* analysis and addressed its scope. The court concluded that there was "no indication in the record that once [the officer] took [the suspect's] hand out of the pocket, [the officer] could not have patted down the pocket to determine whether his fear of a weapon was justified" and, if so, take the necessary steps to remove it. *Id*. The *Casado* court found that the officer's action of proceeding into the suspect's pockets without a pat-down was precisely what the *Terry* Court credited the officer for not doing and was also precisely what the *Sibron* Court found to be unreasonable in scope. *Id*. The court reasoned that "a patdown is ordinarily an effective procedure for detecting a weapon even when the person being frisked is reasonably suspected of being armed and dangerous" and that the Government had proffered no reason that prevented the officer from patting down the suspect effectively. *Id*. Specifically, there was no evidence that indicated that there would have been increased danger from the delay required to conduct a pat down, that the suspect had made any sudden or violent movements, that the one officer was not in control of the suspect's hand, and that the group of officers were not in control of the suspects and the situation. *Id*. at 448. While the *Casado* court noted that it hesitated to criticize the officer's choice of means to protect himself during rapidly developing and potentially dangerous circumstances, it ultimately concluded that the Fourth Amendment did not permit the invasion of the suspect's privacy and that the fruits of the search must be suppressed. *Id*. at 449.

In *United States v. Aquino*, 674 F.3d 918 (8th Cir. 2012), an officer investigating the

transportation of controlled substances at a bus depot identified an individual whose behavior he believed to be suspicious. *Id*. at 920. Specifically, he believed the man was watching the officers' encounters with other individuals and certain packages with unusual interest. *Id*. Eventually, officers approached the man, identified themselves as law enforcement, and asked the man to speak with them. *Id*. The officers also asked if they could search his bag and conduct a pat-down search of his person. *Id*. at 921. The man stated that he did not want the officers to touch him, so they asked him if he would "unzip his coat and hold his clothing next to his body" so that they could tell "if there was anything secured under his clothing." *Id*. The man complied and the officer observed "nothing unusual." *Id*. The officer then asked the man "to do the same thing with his . . . baggy jeans." *Id*. The man complied as to the thigh area but would not comply as to the lower portion of his legs. *Id*. The man also "appeared to be very nervous and fidgety at this point" and was "unable to maintain eye contact" with the officer. *Id*. The officer again asked him to pull his pant leg tight around his ankles and calves, which the suspect made "half-attempts" to do when the officer noticed a "bulge" on the inside of his right calf. *Id*. The officer asked the suspect to "lift his pants above the bulge," which he refused. *Id*. The officer put the suspect in handcuffs as a "precautionary safety measure" and, without conducting a pat-down, lifted the suspect's pant leg above the bulge to reveal a duct-taped bundle strapped on his right leg that the officer believed, based upon his experience and training, contained a controlled substance. *Id*. He removed this package from the suspect and found two other packages taped to the suspect's person, all of which contained methamphetamine. *Id*. The *Aquino* court concluded that the officer "violated the Fourth Amendment when he searched underneath an article of [the suspect's] clothing without his consent and without probable cause to do so, instead of performing a pat down to confirm whether the concealed bulge was a weapon" and

that the evidence obtained as a result was properly suppressed. *Id*. at 923.

Other United States District Courts have also considered situations that are factually analogous to the instant case and have reached differing conclusions. In *United States v. Steve Colon*, No. 97 CR. 449 (LMM), 1998 WL 122595 (S.D.N.Y. 1998), officers received a detailed description of a man wearing rolling skates selling heroin with a firearm at a certain address. *Id*. at *1. When officers located a man matching the description at the reported location, they also saw a man that noticed the law enforcement presence, appeared hesitant and startled, and turned in the other direction "clutching a long object to his right hip, which bulged out from underneath his coat." *Id*. The officers twice directed the man to stop, and he did not comply but quickly walked away. *Id*. As officers began to pursue him, the man began to run while continuing to try to hold the object in place under his long jacket. *Id*. When the man was ultimately apprehended, "still clutching the object to his right hip," the officers "brought him to the ground" and, without conducting a pat down, retrieved a 9 mm semiautomatic handgun measuring sixteen to eighteen inches in length from the man's hip area. *Id*. at *2. Following the reasoning in *Hill* that *Terry* does not limit a weapons search to a pat down, the *Colon* court found that the scope of the intrusion did not violate the Fourth Amendment because the officers confined their search to the area of the bulge. *Id*. at *4.

In *United States v. Hairston*, 439 F. Supp. 515 (N.D. Ill. 1977), an officer initiated a traffic stop of a vehicle due to its loud noise emission. *Id*. at 516. When the driver of the vehicle provided his identification, the officer immediately recognized the man's name "as the ex-leader of the Blackstone Rangers who had recently been released from the penitentiary." *Id* at 517. The officer also "noticed a bulge in the groin area of [the driver's] trousers." *Id*. "Without any pat down or questioning, [the officer] thrust his hand directly into [the driver's] pants" and retrieved a firearm.

*Id.*  The *Hairston* court noted that the only legal violation in question was "a noisy muffler," the suspect was compliant at all times, and that the man's status as a convicted felon did not give law enforcement officers "carte blanche" to search him.  *Id.* at 518.  The court noted that the search was "certainly designed to discover a weapon" but that it went "far beyond" what was reasonable by "retriev[ing] the weapon from his most private area" when "[n]othing in his conduct indicated any need for immediate action or, indeed, any action at all."  *Id.* at 519.  Thus, the *Hairston* court suppressed the evidence obtained in the search as violative of the Fourth Amendment.

Upon review in the instant case, the Court believes that the *Terry*, *Sibron*, and *Dickerson* courts, while not entirely restricting the scope of an investigative search to a pat-down, relied heavily upon the importance of determining the apparent substance of any perceived bulges beneath the clothing by touch before inspecting beneath a person's outer garments.  Thus, the Court finds the reasoning of the *Casado*, *Aquino*, and *Hairston* courts to be most persuasive in the resolution of the instant case.  When Officer Gibson viewed the bulge at the Defendant's waist, it would have been reasonable for him to conduct a pat-down under *Terry* of the bulge to determine if it was a weapon that could be used to harm him or others.  If there had been any circumstances that arose in which a pat-down had not been a safe and feasible option for him, the Court may have found his chosen course of action to be reasonable.  But when Officer Gibson elected to immediately lift the Defendant's shirt to search beneath his clothing to determine the content of the bulge absent any indication that the less-intrusive pat-down was a viable option, the Court believes that this went beyond the scope permitted by *Terry*.

Therefore, for Officer Gibson's actions to be permissible under the Fourth Amendment, the search required probable cause.  The Government has not argued that Officer Gibson had developed

probable cause when he lifted the Defendant's shirt, and the Court believes that the mere viewing of the bulge along with the Defendant's prior unrelated arrest for unlawful firearms possession did not constitute probable cause. *See Aquino*, 674 F.3d at 924 (reasoning that "an officer's observation of a concealed bulge, standing alone, does not amount to probable cause to support an arrest"); *United States v. Tovar-Valdivia*, 193 F.3d 1025 (8th Cir. 1999) (same); *United States v. Jones*, 254 F.3d 692 (8th Cir. 2001) (same). Further, while these cases pertained to probable cause of illegal drug activity, in the instant case, Officer Gibson believed that the bulge was a firearm. At the point he reached beneath the Defendant's clothing to determine the nature of the bulge, he did not know whether the Defendant could lawfully possess a firearm. Thus, his lack of probable cause to conduct a search for a firearm is especially evident.

The Court's recommendation that the Fourth Amendment was violated in the instant case does not end the inquiry into whether the evidence must be suppressed. Even when a constitutional violation occurs, the United States Supreme Court has concluded that a Fourth Amendment violation alone does not necessarily mean that the exclusionary rule applies. In *Hudson v. Michigan*, 547 U.S. 586 (2006) and *Herring v. United States*, 555 U.S. 135 (2009), the United States Supreme Court considered the application of the exclusionary rule and provided guidance for when suppression is the appropriate remedy.

The Court set forth that "[s]uppresion of evidence . . . has always been our last resort, not our first impulse" because the exclusionary rule generates "substantial social costs, which sometimes include setting the guilty free and the dangerous at large." 547 U.S. at 591 (quoting *United States v. Leon*, 468 U.S. 897, 901 (1984)) (internal quotation and citation omitted). The Court noted that it has "repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement

objectives presents a high obstacle for those urging [its] application."  547 U.S. at 591 (quoting

*Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998)) (internal quotation

omitted).  Because the "exclusionary rule is not an individual right," 555 U.S. at 141, the Court has

rejected an "[i]ndiscriminate application" of the rule, 547 U.S. at 591 (quoting *Leon*, 468 U.S. at

908), and has held it to be applicable only "where its remedial objectives are thought most

efficaciously served," 547 U.S. at 591 (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974),

and "where its deterrence benefits outweigh its substantial social costs," 547 U.S. at 591 (citing

*Leon*, 486 U.S. at 907).  "The penalties visited upon the Government, and in turn upon the public,

because its officers have violated the law must bear some relation to the purposes which the law is

to serve."  547 U.S. at 592 (citing *United States v. Ceccolini*, 435 U.S. 268, 279 (1978).

   The exclusionary rule "may not be premised on the mere fact that a constitutional violation

was a 'but-for' cause of obtaining evidence."  547 U.S. at 591.  "[B]ut-for causality is only a

necessary, not a sufficient, condition for suppression."  *Id*.  The question of whether the exclusionary

rule applies "turns on the culpability of the police and the potential of exclusion to deter wrongful

police conduct."  555 U.S. at 137, 143.  "[A]n assessment of the flagrancy of the police misconduct

constitutes an important step in the calculus of applying the exclusionary rule."  *Id*. at 143 (quoting

*Leon*, 486 U.S. at 911) (internal quotations omitted).  If an error arises "from nonrecurring and

attenuated negligence," the goals of the exclusionary rule would not be met by suppression of the

evidence.  555 U.S. at 144. "To trigger the exclusionary rule, police conduct must be sufficiently

deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is

worth the price paid by the justice system."  *Id*.  Thus, the exclusionary rule applies in cases of

"deliberate, reckless, or grossly negligent conduct" or "recurring or systemic negligence."  *Id.*

"The pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers." *Id.* (citation and internal quotations omitted). Otherwise stated, the question is "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances. *Id.* (quoting *Leon*, 468 U.S. at 922, n.23) (internal citations omitted). "These circumstances frequently include a particular officer's knowledge and experience" but do not include his "subjective intent." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996); *Whren v. United States*, 517 U.S. 806, 812-813 (1996)).

This final question is the most difficult in the instant case. As discussed, *supra*, the United States Courts of Appeals and the United States District Courts dispute whether an officer is permitted under *Terry* to proceed to search beneath an individual's clothing if he has reasonable, articulable suspicion to conduct a weapons search. Given this disagreement, it could be argued that Officer Gibson was at worst negligent in his manner of conducting the *Terry* search. However, while this argument has some merit, neither the United States Supreme Court nor the United States Court of Appeals for the Sixth Circuit has ever permitted such a search. On the contrary, the plain language of *Terry*, *Sibron*, and *Dickerson* states that the officer's utilization of the sense of touch via the pat-down procedure is critical to balance the objectives of both the safety of law enforcement officers managing potentially armed and dangerous individuals and the privacy interests that those individuals nonetheless retain.

The Supreme Court has held that the officer's reliance on "binding precedent" is an important inquiry when considering the question of whether evidence should be suppressed and that "[r]esponsible law enforcement officers will care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to those rules." *Davis v. United States*, —

U.S. —, —, 131 S.Ct. 2419, 2426, 2429 (2012) (quoting *Hudson*, 547 U.S. at 599); *see United States v. August Anthony Ford*, No. 1:11-CR-42, 2012 WL 5366049, at *9 (E.D.Tenn. Oct. 30, 2012) (finding that whether an officer complied with Supreme Court precedent is relevant to the inquiry into whether the exclusionary rule applies).  In the instant case, Officer Gibson's conduct was not consistent with binding precedent regarding the permissible scope of a *Terry* stop.

At least one District Court within the Sixth Circuit has examined the question of whether evidence should be suppressed in light of the Supreme Court's decisions in *Hudson* and *Herring* when an officer improperly conducts a *Terry* stop.  In *United States v. Emmanuel J. Moore*, No. 3:08-CR-60, 2009 WL 2929419, at *6-*7 (E.D.Tenn. Sept. 8, 2009), the Court found that "the officers intentionally searched defendant's person under circumstances which did not amount to reasonable suspicion and without defendant's consent."  *Id*. at *7.  The Court concluded that, because the officers should have known the search was unlawful but intentionally conducted it anyway, exclusion of the evidence was appropriate.  *Id*.  While in the instant case, Officer Gibson had reasonable, articulable suspicion to initiate the search, the Court believes he nonetheless exceeded the bounds of *Terry* with the scope of the search as conducted.  Thus, the Court finds the reasoning in *Moore* to be highly persuasive that the exclusionary rule is the proper remedy.

Thus, upon consideration of this weighty question, the Court believes that it was unreasonable and constituted more than mere negligence for Officer Gibson to refrain from conducting a pat-down under the circumstances presented in this case and to proceed to lifting the Defendant's shirt to determine the identity of the non-descript bulge that he viewed and that he believed could be a weapon.  Specifically, the Defendant was complying with Officer Gibson and had done so on every past occasion, the Defendant had not made any furtive or concerning

movements, Officer Gibson had the assistance of Officer Allison and was not outnumbered, the encounter occurred in broad daylight, the incident under investigation did not involve the commission of violence or any unusual concerns that the weapon had been or would be used against the officer or others, and there is no indication that the delay to perform a pat-down on the outside of the Defendant's clothing would not have been feasible.

Further, although the prior incidents in which Officer Gibson commanded the Defendant to lift his shirt are not directly before the Court in the instant motion, they demonstrate that Officer Gibson's searches beneath the Defendant's clothing were a recurring means to investigate whether the Defendant possessed a weapon at any given time. These prior incidents are particularly concerning because, on those occasions, the record does not reflect that Officer Gibson had any reasonable, articulable suspicion that the Defendant may be armed and dangerous or that criminal activity may be afoot; on the contrary, based solely upon the Defendant's prior unlawful weapon arrest, Officer Gibson would apparently command the Defendant to be searched beneath his clothing simply because he randomly encountered him in public places. The recurring nature of these incidents is another critical factor under *Herring* for determining that the exclusionary rule is appropriate.

Ultimately, the Court believes that it was unreasonable for Officer Gibson to conduct a *Terry* search in this manner, that Officer Gibson's conduct rises to sufficient culpability to make the application of the exclusionary rule appropriate, and that the deterrence gained by exclusion of the evidence outweighs the extremely weighty social costs of suppressing this evidence. Accordingly, it is RECOMMENDED that Defendant's Motion to Suppress be GRANTED. Specifically, the Court RECOMMENDS that the firearm and ASP baton obtained as a direct result of the illegal

search should be suppressed. Further, as to the additional evidence obtained thereafter, including the altered and unaltered security guard badges, the Court RECOMMENDS that they should be suppressed pursuant to *Wong-Sun* as fruit of the poisonous tree because this evidence was obtained "by exploitation of that illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488.

### III. Conclusion

For the reasons set forth herein, it is ORDERED that Defendant's Motion to Strike is MOOT and it is RECOMMENDED that Defendant's Motion to Suppress be GRANTED.


**DATED** this 17th day of June, 2014.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)©. FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**